**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION**

IRIS WIRELESS LLC,

 Plaintiff,

v.                 Case No: 8:14-cv-1741-T-30TGW

SYNIVERSE TECHNOLOGIES,

 Defendant.

## ORDER

THIS CAUSE comes before the Court upon the Defendant's Motion to Dismiss Complaint Pursuant to Federal Rule of Civil Procedure 12(b)(6) (Dkt. #16) and Plaintiff's Response in Opposition (Dkt. #30). Upon review and consideration, it is the Court's conclusion that the Motion should be granted in part and denied in part.

### *Background*

Plaintiff, Iris Wireless, LLC ("Iris") sues Defendant, Syniverse Technologies, LLC ("Syniverse") for violations of the Communications Act, 47 U.S.C. §§ 201 and 202, antitrust claims under Section 2 of the Sherman Act, 15 U.S.C. § 2, and Va. Code § 59.1-9.6. Syniverse and Iris are "Inter-Carrier Vendors" ("ICVs") also known as messaging interoperability service vendors. A messaging interoperability service allows wireless telephone service providers to exchange short message services ("SMS"), commonly known as "text messages," with other service providers. This service allows text messages

that originate from the mobile phone of one wireless carrier's customer to be read by an owner of a mobile phone using a different wireless carrier. There are only three ICV providers in the United States: Iris, Syniverse, and SAP, a non-party to this action.

The process by which the ICVs transmit text messages between different wireless carriers is called "peering services." Iris and Syniverse entered into a peering services agreement (the "Agreement") in 2004. The Agreement states that Iris and Syniverse would provide peering services to each other on a "zero pay" basis, whereby each party would collect and retain all revenue from its respective wireless provider clients. The Agreement allowed for automatic renewal on a year to year basis unless either party terminated the contract in writing. In July 2011, Syniverse requested that Iris pay 1.5 cents for every text message that Syniverse deemed to be "out of balance" between respective wireless carrier customers or else it would terminate the Agreement. Iris refused to pay and Syniverse terminated the Agreement and ended connectivity between Iris and Syniverse's networks. Further, Syniverse informed Iris' customers that it would no longer honor its peering arrangement with Iris and that Iris was in serious financial trouble.

Since Syniverse terminated the Agreement, Iris has suffered significant harm to its business. Iris alleges that these actions will ultimately harm the telecommunications industry by hurting smaller carriers which will negatively impact mobile wireless consumers. It claims that "[m]any smaller carriers rely upon Iris to route wireless messages[]" and therefore "Syniverse's termination will force smaller carriers to have to

work with a different peering company, and will require them to accept whatever rates those carriers charge for handling wireless traffic."

## I.  Motion to Dismiss Standard

Federal Rule of Civil Procedure 12(b)(6) allows a complaint to be dismissed for failure to state a claim upon which relief can be granted. When reviewing a motion to dismiss, a court must accept all factual allegations contained in the complaint as true, and view the facts in a light most favorable to the plaintiff.  *See Erickson v. Pardus*, 551 U.S. 89, 93-94 (2007). However, unlike factual allegations, conclusions in a pleading "are not entitled to the assumption of truth." *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1950 (2009). On the contrary, legal conclusions "must be supported by factual allegations." *Id*. Indeed, "conclusory allegations, unwarranted factual deductions or legal conclusions masquerading as facts will not prevent dismissal." *Davila v. Delta Air Lines, Inc.*, 326 F.3d 1183, 1185 (11th Cir. 2003).

## II.  Defendants Motion to Dismiss

Syniverse seeks to dismiss the entire Amended Complaint for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). It argues that Iris' Communications Act claims (Counts I and II) fail to state a cause of action because they impermissibly seek declaratory and injunctive relief under sections 201 and 202 of the Communications Act which permit damages only. Further, it argues that those sections only impose obligations to "common carriers," and Syniverse is not a common carrier under the Act.

As to Iris' antitrust allegations (Counts III and IV), Syniverse argues that Iris fails to allege mandatory elements for its "refusal to deal" claims because it fails to allege that Syniverse lacked a legitimate business justification for terminating the Agreement. It also claims that Iris fails to sufficiently plead a relevant product market or a dangerous probability that Syniverse will obtain monopoly power.  If the Court dismisses Iris' federal claims, it will lack jurisdiction over Iris' state law claims.

### III.      Violations of the Communications Act

In Count I and II of the Amended Complaint labeled "declaratory judgments," Iris alleges that because Syniverse is a common carrier of telecommunications services it is therefore obligated to provide communication services to Iris upon request. Therefore, Syniverse's termination of the Agreement was unlawful because Iris requested its renewal. The second claim in violation of section 202 alleges that Syniverse is not permitted to discriminate in the provision of communications services and by refusing to continue to provide Iris with free peer services, Syniverse is engaging in discrimination.

Iris relies on 47 U.S.C. § 207 to bring its claims which provides that "[a]ny person claiming to be damaged by any common carrier subject to the provisions of this chapter may either make complaint to the Commission…or may bring suit for the recovery of the damages for which such common carrier may be liable under the provisions of this Chapter." However, section 207 does not provide for injunctive relief. Nonetheless, Iris argues that it is requesting that the Court "settle a controversy between the parties as to Syniverse's obligations under the Communications Act, which is wholly separate from an

4

injunction." The Court finds this argument unpersuasive. Although Iris labels its claims as "declaratory," its prayer for relief specifically requests that the Court *enjoin* Iris from engaging in its violation of the Communications Act and order it to maintain its zero pay peer agreement. It further alleges that it would be severely and irreparably harmed, having no remedy at law if the Court does not *enjoin* the Defendant. It makes no demand for recovery of damages under the Communications Act.

Although federal courts "generally have inherent power to grant injunctive relief," …"this power can be limited by statute." *Conboy v. AT & T Corp.*, 241 F.3d 242, 254 (2d Cir. 2001) (holding that a private party lacks standing under sections 206 and 207 to request injunctive relief for violation of the Communications Act.) *See also N. Valley Communications, LLC v. Sprint Communications Co. Ltd. P'ship,* 618 F.Supp. 2d 1076, 1083–84 (D.S.D. 2009) (holding that *Conboy* is persuasive and extends to private claims brought under section 207 of the Communications Act as a private cause of action for violations of the Act does not originate from specific provisions but is found in 47 U.S.C. §§ 206 and 207 which do not provide for injunctive relief in federal court). Section 207 of the Communications Act makes no reference to claims for injunctive relief in district courts. Therefore, Iris has failed to state a claim.

Even if Iris did properly request declaratory relief under sections 201 and 202, the claims would still be subject to dismissal. Iris states in a conclusory manner that ICVs are common carriers, but it has not alleged that the Federal Communications Commission ("FCC") has made that determination nor has it alleged that the FCC has ruled that

5

Syniverse's conduct violates the Act. The FCC is tasked with providing guidance to courts regarding this specific issue. In the case of *N. Cnty. Commc'ns Corp. v. Cal. Catalog & Tech.*, 594 F.3d 1149 (9th Cir. 2010), the court upheld the district court's dismissal of a declaratory judgment claim under section 201(b). The decision stated that a court should not "fill in the analytical gap" where the FCC has not made a determination regarding whether a company's action violates section 201(b). 594 F.3d at 1158. Therefore, if the Court were to make a declaratory ruling on the issue it would "put interpretation of a finely-tuned regulatory scheme squarely in the hands of private parties and some 700 federal district judges, instead of in the hands of the Commission." *Id.* (quoting *Greene v. Sprint Commc'ns*, 340 F.3d 1047, 1053 (9th Cir. 2003)) (alteration and internal quotation marks omitted).  *See also Hoffman v. Rashid*, 388 F. App'x 121 (3d Cir. 2010) (per curiam) ("[I]t is within the purview of the Federal Communications Commission, … to determine whether a particular practice constitutes a violation for which there is a private right to compensation")(internal quotations and citations omitted). The Court agrees with this conclusion. Therefore, the Court will dismiss Count I and II of the Amended Complaint.

    **IV.**    **Antitrust Violations**

        **a.**    **Monopolization**

In Count III and IV of the Amended Complaint, Iris raises federal and state antitrust claims.  Iris relies on Section 2 of the Sherman Act which states that "[e]very person who shall monopolize, or attempt to monopolize, ... any part of the trade or commerce among the several States, ... shall be deemed guilty of a felony...." 15 U.S.C. § 2. Iris must prove

two elements of monopoly under section 2 of the Sherman Act: (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident. *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71 (1966).  Iris' Virginia state law claims parallel federal law, and a disposition of the antitrust claim under federal law justifies a similar disposition with respect to the state law claim. Va. Code § 59.1-9.17 ("[t]his chapter shall be applied and construed to effectuate its general purposes in harmony with judicial interpretation of comparable federal statutory provisions."); *Cavalier Tel., LLC v. Verizon Va., Inc*. 330 F. 3d 176, 182 n. * (4th Cir. 2003).

The first element, monopoly power, is the power to control prices in or to exclude competition from the relevant market. *United States v. E.I. du Pont de Nemours & Co.,* 351 U.S. 377, 391 (1956). The second element requires predatory or exclusionary acts or practices that have the effect of preventing or excluding competition within the relevant market. *Morris Communications Corp. v. PGA Tour, Inc.,* 364 F.3d 1288, 1294 (11th Cir. 2004) (citing *United States v. Microsoft*, 253 F.3d 34, 58 (D.C.Cir. 2001)). In order for a practice to be exclusionary, "it must harm the competitive process and thereby harm consumers." *Id*. "[H]arm to one or more competitors will not suffice" for a section 2 violation. *Id. See also Consultants & Designers, Inc. v. Butler Serv. Group, Inc.*, 720 F.2d 1553, 1562 (11th Cir. 1983).

The leading case for section 2 liability based on refusal to cooperate with a rival, and the case upon which Iris relies, is *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985). In *Aspen Skiing,* the plaintiff and defendant had a joint ticket arrangement which allowed consumers to purchase tickets to ski on all four major ski areas at a discount. The defendant owned three of the areas and the plaintiff owned the remaining one. The defendant provided its services to the public, and after canceling the joint ticket arrangement previously held with plaintiff, refused to sell its services to the plaintiff even at retail price. The Court upheld that the jury's finding that the defendant had no valid business reason for terminating the voluntary agreement and therefore violated the Sherman Act. *Id*. The defendant's termination of a voluntary (and presumably profitable) agreement with the plaintiff suggested a "willingness to forsake short-term profits to achieve an anticompetitive end." *Verizon Communications Inc. v. Law Offices of Curtis V. Trinko, LLP,* 540 U.S. 398, 408 (2004).

In *Otter Tail Power Co. v. United States*, 410 U.S. 366, (1973), another case relied upon by Iris, an electric company refused to sell power to municipalities at wholesale rates to prevent those municipalities from competing in the retail market. The Court held that the defendant violated the Sherman Act when it refused to sell its services wholesale to the municipalities, particularly when it was already in the business of providing that service to another specific segment of customers. *Id*. at 370-371, 377-378.

Generally, a company may decide with whom it chooses to deal. *Aspen Skiing*, 472 U.S. at 601–02 (quoting *United States v. Colgate & Co.,* 250 U.S. 300, 307, 39 S.Ct. 465,

468, 63 L.Ed. 992 (1919)). Even a company with monopoly power has no general duty to cooperate with its competitors and may refuse to deal with them if valid business reasons exist. *See Mid-Texas Communications Sys., Inc. v. Am. Tel. & Tel. Co.*, 615 F.2d 1372, 1388 (5th Cir. 1980).   The exception as outlined in *Aspen Skiing* and *Otter Tail* is a narrow one. *See Law Offices of Curtis V. Trinko, LLP*, 540 U.S. at 408-09 ("*Aspen Skiing* is at or near the outer boundary of § 2 liability.") In *Trinko*, the court held that the complaint alleging breach of incumbent local exchange carrier's duty under the Communications Act to share its network with competitors did not meet this narrow exception where the products were not available to the public but were provided to rivals under compulsion and at considerable expense.

     The refusal to deal claim in the Amended Complaint alleges sufficient facts to articulate a cause of action under the narrow exception outlined in *Aspen Skiing* and *Otter Tail.* An antitrust claim brought under section 2 of the Sherman Act involves fact intensive analysis, and motions to dismiss these claims should be granted very sparingly. *Hosp. Bldg. Co. v. Trustees of Rex Hosp.*, 425 U.S. 738, 746 (U.S. 1976) ("in antitrust cases, where "the proof is largely in the hands of the alleged conspirators, dismissals prior to giving the plaintiff ample opportunity for discovery should be granted very sparingly.") (internal quotations and citations omitted). *See also Andrx Pharms., Inc. v. Elan Corp., PLC*, 421 F.3d 1227, 1236 (11th Cir. 2005) (recognizing that "antitrust cases are 'fact-intensive,' and require appropriate market analysis, and therefore are typically inappropriate for a Rule 12 dismissal") (quotations and citations omitted). Based on the allegations, Iris and Syniverse

had a long course of dealing through the provision of reciprocal peering services at no cost. Iris alleges that Syniverse benefitted from the Agreement since its customers were able to send text messages to Iris' customers and has offered no legitimate procompetitive reason for terminating the Agreement. Therefore, the Court concludes that Iris has sufficiently alleged a monopolization claim under Section 2 of the Sherman Act.

### b. Attempted Monopolization

The Sherman Act also outlaws the "attempt to monopolize ... any part of the trade or commerce among the several States, or with foreign nations." 15 U.S.C. § 2. The Supreme Court defines an attempt to monopolize as, "… the employment of methods, means and practices which would, if successful, accomplish monopolization, and which, though falling short, nevertheless approach so close as to create a dangerous probability of it[.]" *Am. Tobacco Co. v. United States*, 328 U.S. 781, 785, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946). Therefore, to establish a violation of section 2 for attempted monopolization, "a plaintiff must show (1) an intent to bring about a monopoly and (2) a dangerous probability of success." *Levine v. Cent. Fla. Med. Affiliates, Inc.*, 72 F.3d 1538, 1555 (11th Cir. 1996) (internal quotation marks omitted).

A dangerous probability of success arises when the defendant comes close to achieving monopoly power in the relevant market. *See id. See also Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 459, 113 S.Ct. 884, 122 L.Ed.2d 247 (1993). A plaintiff can show this dangerous probability of success only if it can properly define the relevant

market, which has both product and geographic dimensions. *T. Harris Young & Assocs. v. Marquette Elecs.,* 931 F.2d 816, 823 (11th Cir. 1991).

A plaintiff defines a product market in part by showing whether a group of manufacturers "because of the similarity of their products, have the ability—actual or potential—to take significant amounts of business away from each other." *Gulf States Reorganization Group, Inc. v. Nucor Corp.*, 721 F.3d 1281, 1286 (11th Cir. 2013) (internal quotations omitted). One way to decide if a company can take business away from an attempted monopolist is to analyze the concept of cross-elasticity of supply, which "looks at competition from the production end instead of the consumer end." *Id.* (citing *Spectrofuge Corp. v. Beckman Instruments, Inc.,* 575 F.2d 256, 280 n. 79 (5th Cir. 1978)). Therefore, if the condition exists such that a monopolist of a product would have little power to increase its price above the competitive level, the market has high cross elasticity and the defined product market would not support a finding of monopolization or attempted monopolization. *See id.*

The geographic market encompasses the area in which the defendant effectively competes and extends to the area of effective competition where buyers can turn for alternate sources of supply. *Otter Tail Power Co.*, 410 U.S. at 377. "The outer boundaries of a product market are determined by the reasonable interchangeability of use of the cross-elasticity of demand between the product itself and substitutes for it." *T. Harris Young & Assoc., Inc.*, 931 F.2d at 824.

11

The Court concludes that Iris has sufficiently alleged enough facts to support its proposed relevant market. Iris alleges that the relevant market is the market for ICV services in North America, which includes only three ICV peer service providers. Further, the allegations state that the market is characterized by significant barriers to entry including technological and economical hurdles.  Additionally, Iris states that the only other alternative to ICVs is for mobile wireless providers to "connect[] to each and every one of the wireless networks carriers globally." This process is complex, timely and expensive which necessitated the development of ICVs in the first place.  At this stage, these allegations are sufficient to satisfy the requirements of Federal Rule of Civil Procedure 8(a).  *See Global Candle Gallery Licensing Co. v. Nabozny*, No. 8:08–cv–2532–T–30TGW, 2009 WL 3852794 (Nov. 18, 2009) (Moody, J.).

The Court further concludes that Iris has sufficiently pled Syniverse's dangerous probability of obtaining monopoly power given that Iris alleges that Syniverse holds "50% or more" of the relevant market.   This Circuit has held that market shares of between 60% and 65% suffice to raise a jury question on the issue of market power. *See U.S. Anchor Mfg., Inc. v. Rule Indus., Inc.*, 7 F.3d 986 (11th Cir. 1993); *McGahee v. Northern Propane Gas Co.*, 858 F.2d 1487, 1506 (11th Cir. 1988). Where an alleged monopolist's market share is less than 50% of the relevant market, there is no dangerous probability of success, and therefore no attempted monopolization, as matter of law. *Gulf States Reorganization Group, Inc. v. Nucor Corp.*, 822 F. Supp. 2d 1201 (N.D. Ala. 2011) *aff'd*, 721 F.3d 1281 (11th Cir. 2013) (citing *U.S. Anchor Mfg., Inc.*, 7 F.3d at 1001). Since there are several

factors that may be relevant to whether a particular market share evidences a dangerous probability of success, in addition to the actual percentage of the market share, the Court concludes that the allegations are sufficient at this stage of the proceedings to survive a motion to dismiss. *See U.S. Anchor Mfg., Inc.*, 7 F.3d at 999.

    For the foregoing reasons, it is ORDERED AND ADJUDGED that:

1. Defendant's Motion to Dismiss the Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) (Dkt. #16) is GRANTED in part and DENIED in part.

2. Counts I and II of Plaintiff's Amended Complaint are dismissed.

3. Defendant shall file an answer to the Amended Complaint within fourteen (14) days of the date of this Order.

**DONE** and **ORDERED** in Tampa, Florida, this 8th day of September, 2014.

_____
JAMES S. MOODY, JR.
UNITED STATES DISTRICT JUDGE

Copies furnished to:
Counsel/Parties of Record

S:\Odd\2014\14-cv-1741- mtd 16.docx